# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| LASHIKA WYNN, RONETRA ANTWINE, BERNITA BROOKER, RAMONA WURM, ANNIE RIDLEY, MICHELLE WILLIAMS, on behalf of themselves and others similarly situated,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>FIVE STAR QUALITY CARE TRUST and MORNINGSIDE OF BELMONT,<br><br>　　　　Defendants, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)　Case No. 3:13-cv-01338<br>)　Judge Aleta A. Trauger<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM

On December 12, 2013, the plaintiffs filed a Complaint that asserts individual and class claims against the defendants. (Docket No. 1.) Pending before the court are several motions related to the disposition of those claims. The defendants have a filed a Motion to Compel Arbitration of all claims other than those asserted by plaintiff Lashika Wynn (Docket No. 8), to which the plaintiffs (other than Wynn) have filed a Response in opposition (Docket No. 18), Five Star filed a Reply (Docket No. 27), and the responding plaintiffs, with leave of court, filed a "Sur-Reply and, in the Alternative, Memorandum for this Court to Retain Plaintiffs' Class/Collective Action Claims" (Docket No. 31), to which the defendants filed a Response in Opposition (Docket No. 32). With respect to the claims by plaintiff Wynn, the defendants have filed a separate Partial Motion to Dismiss or, in the Alternative, for a More Definite Statement (Docket No. 10), to which Wynn filed a Response in opposition (Docket No. 17), and the defendants filed a Reply (Docket No. 23).

For the reasons explained herein, the Motion to Compel Arbitration will be granted and the court will order Wynn, whose claims are not subject to arbitration, to file a more definite statement.

## BACKGROUND

The plaintiffs assert claims against their former employer, Five Star Quality Care Trust ("Five Star") and Morningside of Belmont ("Morningside"), the Nashville assisted living facility at which they formerly worked as staff members. Collectively, they claim that the defendants are liable for (1) race discrimination under 42 U.S.C. § 1981, (2) retaliation in violation of the Tennessee Adult Protection Act ("TAPA"), and (3) unspecified claims under "Tennessee common law." They purport to bring the §1981 claims on behalf of themselves and all others similarly situated. Broadly, the Complaint alleges that, under the stewardship of Morningside's Executive Director Lee Parker, Five Star systematically discriminated against black employees at Morningside in an effort to (allegedly in Parker's own words) "get rid of all the monkeys."[1] The

---

[1] The Complaint alleges that, under Parker's administration, the defendants engaged in a systematic pattern and practice of discrimination and adverse actions against black employees, including "denials of promotions, demotions, adverse transfers, constructive discharges, unwarranted and undeserved performance reprimands, unlawful terminations, offensive comments, hostile treatment and discriminatory disposition, and other acts demonstrating racial animus against black employees." It alleges that the "[t]he treatment against black employees was comparatively harsher than the treatment of white or Caucasian employees." The Complaint also alleges that "[w]hite employees did not receive similar treatment under the administration by Lee Parker for acts of misfeasance or general treatment at Morningside." The Complaint draws no distinctions among the plaintiffs with respect to these alleged forms of disparate treatment. Instead, it broadly alleges that "[e]ach individual black Plaintiff suffered actionable adverse action that was motivated by their race, including terminations, demotions, hostility, and other acts motivated by racial animus." The Complaint also alleges that the defendants treated "all named Plaintiffs[], as well as other black employees similarly situated, differently in terms, conditions, privileges, and benefits of employment tha[n] it treated other non-black employees at Morningside of Belmont."

Complaint also alleges that Five Star terminated Wynn and Antwine for reporting that a fellow employee had abused an elderly resident and that Parker had attempted to cover it up by discharging that resident based on a false pretense.[2]

The defendants have moved (1) to compel arbitration of all claims other than those brought by Wynn and (2) to dismiss Wynn's claims or to have her file a more definite statement. The plaintiffs argue that, even if the court finds that plaintiffs other than Wynn must arbitrate their individual claims, the court should permit those plaintiffs' class claims to proceed in this court.

## MOTION TO COMPEL ARBITRATION

### I. Five Star's Dispute Resolution Policy[3]

In April 2012, Five Star implemented a new dispute resolution policy nationwide. Under the new policy, disputes between Five Star and its employees (and prospective employees) would be resolved through a grievance process and mutually binding arbitration, as set forth in a "Mutual Agreement to Resolve Disputes and Arbitrate Claims."[4] Five Star provided one version of this Agreement to its existing employees and a slightly different version of the Agreement to new employees, both of which contained essentially the same underlying terms.

---

[2] This incident presumably forms the basis for Wynn and Antwine's TAPA claims.

[3] The parties have filed affidavits setting forth facts related to Five Star's dispute resolution policy and its implementation. The defendants have filed the Declaration of Lee Parker, the Supplemental Declaration of Lee Parker, the Declaration of Martha Forrester, the Supplemental Declaration of Martha Forrester, the Declaration of Glenna Milliken, the Declaration of Emily Luo, and the Declaration of Beverly Gardner. (Docket No. 8, Ex. 1-5; Docket No. 28, Exs. 1-3.) The plaintiffs have filed the Declaration of Roneta Antwine and the Declaration of Annie Ridley. (Docket No. 18, Exs. 2 and 3.)

[4] For the sake of simplicity, the court will use only the term "arbitrate" to describe the grievance and arbitration process.

In most relevant part, the Agreement obligates the parties to arbitrate all claims through a single-day hearing before a National Arbitration and Mediation ("NAM") arbitrator, whose decision (per the terms of the Agreement) is subject to an appeal to a three-arbitrator panel for abuse of discretion. Five Star pays all costs of the arbitration (including NAM's fees and the arbitrator's fees), Five Star contractually binds itself *not* to pursue costs from employee claimants who do not prevail in arbitration, and Five Star agrees that it will not hire an attorney to defend against claims brought by an employee unless the employee herself is represented by counsel. The Agreement also (1) contains a waiver of the right to pursue class or collective relief; (2) sets forth seemingly invariable limitations on pre-hearing discovery that are more limited than NAM's default procedures,[5] and (3) permits the arbitrator to award fees and expenses to the prevailing party "only if expressly required by an applicable statute or law" or "if the arbitrator determines that a failure to award attorneys' fees and expenses would be unconscionable under applicable law."

The Agreement states that "all disputes regarding the enforcement of this Agreement, any of the provisions of this Agreement or whether a party's claim is subject to this Agreement shall

---

[5] Under the Agreement's terms, to the extent any party seeks discovery, it is limited to five interrogatories, five requests for production, and two depositions. Electronic discovery is limited to searches of e-mail accounts of no more than two accounts for a twelve-month period based on five search terms. The Agreement does not contain any exception granting the arbitrator discretion to vary from these restrictions. By contrast, the NAM "Employment Rules and Procedures" provide for mandatory initial document disclosures, 20 interrogatories, 30 document requests, and three depositions. The NAM rules also grant the arbitrator discretion to permit additional discovery based on a showing of "substantial need," provided that additional discovery is not "overly burdensome and will not unduly delay conclusion of the Arbitration." On a separate note, the court observes that NAM's procedures also permit each party to subpoena witnesses to appear at the arbitration hearing, to offer evidence that is "relevant and material," and to file pre- and post-hearing briefs.

be determined in accordance with the law of the State of Maryland."[6]  The agreement expressly

states that "[a]ll challenges to the enforceability of any provision of this Agreement shall be

brought before the arbitrator, and the arbitrator shall rule on all questions regarding the

interpretation and enforceability of this Agreement."  The court will refer to this provision,

which delegates authority to the arbitrator to determine certain threshold issues, as the

"Delegation Provision."  *See Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63 (2010).  In

contrast to the threshold issues concerning the interpretation and enforceability of the

Agreement, which are governed by Maryland law, "the law of the jurisdiction in which [the

employee] is primarily employed will govern the substance of [the employee's] grievance."

The version of the Agreement provided to existing employees states, in its preamble, that

"the Company *has adopted* the following grievance and arbitration procedures."  (emphasis

added).  In a section entitled "Consideration," it states that "your continued employment with the

Company subsequent to the effective date of this Agreement . . . shall constitute consideration

and acceptance by you of the terms and conditions set forth in this Agreement."

However, perhaps atypically, Five Star elected to provide its existing employees an

option to opt out of the otherwise binding grievance process that it had adopted.  In the first

section of the Agreement (located on its first page and bearing Roman numeral "I"), the

Agreement contains a paragraph that is worth quoting in full:

> All Company employees are automatically covered by the grievance process . . . and the
> arbitration process . . . by continuing a job with the Company unless they are qualified to
> opt out as described below.  That means that all employees must, as a condition of
> employment, arbitrate any and all disputes . . . not resolved through the grievance

---

[6] The Complaint alleges that Five Star is a Maryland corporation with a principal office in
Newton, Massachusetts, and that Morningside of Belmont is a Delaware corporation with a
principal office in Newton, Massachusetts.

process. However, the Company is electing to allow employees employed by the Company prior to the effective date of this Agreement to exclude themselves from the arbitration process by notice given to the Company within thirty (30) days after their receipt of a copy of this Agreement. **ACCORDINGLY, UNLESS YOU EXCLUDE YOURSELF FROM THE ARBITRATION PROCESS BY MAILING TO THE COMPANY BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, AN OPT OUT ELECTION FORM WITHIN SUCH THIRTY (30) DAY PERIOD, YOU WILL BE COVERED BY THIS AGREEMENT.** The Opt Out Election Form is available by contacting a member of the Company's Human Resources Department [contact information]. Whether you choose to remain covered by this Agreement or to exclude yourself has no negative effect on your employment.

As to new employee applicants, the new dispute resolution policy was a condition of employment by Five Star and its affiliates – *i.e.*, there was nothing for them to "opt out" of in the first place. Thus, understandably, the version of the Agreement presented to new employees did not include this paragraph explaining the opt-out options.

Existing employees who received the Agreement were required to sign a document entitled "**IMPORTANT NOTICE REGARDING YOUR EMPLOYMENT WITH FIVE STAR [:] RECEIPT AND ACKNOWLEDGEMENT FORM**." The Acknowledgment Form states that "Five Star is introducing a new dispute resolution program that will affect the way disputes in connection with your employment are resolved." It states that the Mutual Agreement to Resolve Disputes and Arbitrate Claims described the new program in detail, and it provides bullet points describing the basic features of the Agreement's terms. It also contains a bullet point stating that the Agreement sets forth "[s]teps you must take if you wish to decline to participate in the new program." The Acknowledgement Form advises employees (1) to "take the time to review carefully this important document," (2) to "please contact your Executive Director/Administrator or a member of the Human Resources team" with any questions, and (3) that employees "have the right to ask a lawyer about the effect and meaning of the Agreement."

Finally, the Acknowledgement Form contains a signature block below a line stating that "I acknowledge receipt of the Mutual Agreement to Resolve Disputes and Arbitrate Claims."

## II. <u>Facts Specific to the Plaintiffs and the Morningside Facility</u>

### A. Ridley

On May 14, 2012, Five Star provided an electronic copy of the Agreement to Ridley, along with an electronic acknowledgment form containing slightly different terms than the written Acknowledgment Form.[7] The electronic cover information provided to Ridley includes a section entitled "Arbitration Agreement," which states that Five Star is introducing a new dispute resolution policy as set forth in "the attached link" to the Agreement, that Ridley "should take the time to carefully review this important document," that Ridley can contact Human Resources with any questions, and that Ridley should electronically acknowledge that she had "received and read the Agreement." Below that section, the page contains a section entitled "ACKNOWLEDGMENT FORM: **Five Star Quality Care Arbitration Agreement**," which states: "I acknowledge that I have received and read the Five Star Quality Care Arbitration Agreement and I understand my rights and obligations under the Arbitration Agreement." On May 22, 2012, Ridley electronically signed that acknowledgement form.

### B. Antwine, Booker, and Wurm

Five Star's company policy was to have facility directors and business managers distribute and explain the Agreement and Acknowledgment Form to staff at staff-wide meetings at each particular Five Star-affiliated facility. Consistent with that company-wide practice, Morningside Executive Director Parker and Business Manager Martha Forrester held a meeting

---

[7] At least at Morningside, Five Star apparently distributed the Agreement to supervisory personnel, such as Ridley, before distributing it to other staff members.

with Morningside's staff, including plaintiffs Antwine, Booker, and Wurm. According to affidavits from Parker, Forrester, and non-plaintiff African-American Morningside employee Beverly Gardner, Parker presented the Agreement and Acknowledgment Forms at the meeting, explained the Agreement's terms thoroughly and accurately, explained that the Agreement would apply to existing employees unless they opted out through specific steps (which he explained), encouraged employees to speak with an attorney if they had questions, and told employees that they needed to sign the Acknowledgment Form but also told them that they could spend more time reviewing it at home before signing it.

Plaintiff Antwine disputes this account, stating that Parker told everyone present that the program was an "opt-in" program – *i.e.*, that it would not apply unless an employee chose to participate in it. Antwine contends that, after hearing Parker explain the features of the dispute resolution process (the waiver of the right to bring claims in court, the class action waiver, and the like), she believed its terms were "one-sided, oppressive, and would not allow me to effectively pursue any lawsuits I had or would have in the future against Morningside." Antwine claims (in contrast to Gardner, Parker, and Forrester's accounts) that she, Booker, and Wurm "rejected, vehemently objected to, and verbally expressed our hostilities towards the Mutual Agreement and arbitration process as presented." According to Antwine, she "believes" that the copy of the Agreement she received had a signature page. She also claims that she understood the Acknowledgment Form to be a "cover sheet" for a "proposal" to enter into the Agreement. Antwine claims that she spoke with Booker and Wurm, who confirmed that they also "rejected"

signing the Agreement.[8]  Finally, Antwine avers that Parker "demanded" that employees sign the Acknowledgment Form at the meeting and refused to provide employees sufficient time to review the Agreement before signing the Acknowledgment Form.

Antwine and Wurm signed the Acknowledgement Form on June 1, 2012 (the date of the meeting).  According to Forrester, plaintiff Booker did express concerns to her at the meeting about the Agreement.  Forrester therefore advised Booker to take the form home with her and review it with an attorney, if she wanted to.  Consistent with Forrester's account, Booker did not sign and return the Acknowledgement Form until June 21, 2012 – 20 days after the meeting.  In fact, fifteen of the staff members present at the June 1 meeting did not return signed Acknowledgment Forms until 19 or more days after the meeting.  Indeed, one employee returned the Acknowledgement Form on July 16, 2012, accompanied by a notation that she had "received the OPT-OUT form + am sending it cert/reg mail to the appropriate address."

### C.  Williams

After Five Star implemented the dispute resolution policy, Williams joined Five Star as a new employee.  On February 4, 2013, she received a letter from Five Star containing a "contingent offer of employment," which was expressly contingent upon, *inter alia*, her "execution of the enclosed Mutual Agreement to Resolve Disputes and Arbitrate Claims."  The letter stated that Williams would "indicate her acceptance of this offer by signing below [in the letter] and returning the original copy of this letter and the Mutual Agreement to Resolve Disputes to me on or before your first day of employment."  The letter enclosed an

---

[8] Under the Federal Rules of Evidence, Antwine's testimony about what Booker and Wurm told her would be inadmissible hearsay.  Notably, the record contains no affidavit from Booker or Wurm.

acknowledgement form that was substantially similar to that provided to Five Star's existing employees in mid-2012, save for (1) the omission of the bullet point relating to the "opt-out" provisions (for obvious reasons), (2) the omission of a signature line, and (3) the inclusion of a statement that signing the Agreement itself was a "condition of your employment with Five Star." The attached Agreement, which naturally omitted language relating to an "opt-out" provision, contained a signature block, which Williams signed. Unlike plaintiffs Antwine, Wurm, Booker, and Ridley, Williams does not dispute that she assented to the Agreement.

### D. Wynn

For reasons not specified, the parties agree that Wynn's claims are not subject to Five Star's dispute resolution procedures and, therefore, are not subject to mandatory arbitration.[9]

### III. Analysis

### A. The Plaintiffs' Challenges

Under the Federal Arbitration Act ("FAA"), agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "This text reflects the overarching principle that arbitration is a matter of contract" and, "consistent with that text, courts must 'rigorously enforce' arbitration agreements according to their terms[.]" *Am. Express Co. v. Italian Colors Restaurant*, 133 S.Ct. 2304, 2309 (2013). The FAA embodies a "liberal federal policy favoring

---

[9] Based on the Complaint allegations, Five Star employed Wynn at least from September 2013 through an unspecified termination date. Presumably, Wynn would have been subject to the Agreement's terms unless she opted out of them. If she in fact opted out, it is surprising that the defendants did not raise this point to the court as further evidence that Morningside staff understood their opt-out obligations following the June 2012 meeting.

arbitration agreements." *CompuCredit Corp. v. Greenwood*, 132 S.Ct. 665, 669 (2012) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).

Here, the plaintiffs assert challenges that can be grouped into two categories: (1) plaintiffs Antwine, Booker, Wurm, and Ridley argue that they did not agree to arbitrate their claims in the first place;[10] and (2) those four plaintiffs and Williams argue that the terms of the Agreement prevent them from effectively vindicating their substantive rights and, therefore, should not be enforced. The parties agree that, notwithstanding the Delegation Provision, the court has jurisdiction to decide whether they entered into an arbitration agreement in the first place.[11]

### B. Assent to the Agreement

As an initial matter, with respect to whether the parties executed an Agreement, the parties dispute what law to apply: the defendants argue that Maryland law should apply because the Agreement specifies that Maryland law governs its interpretation. The plaintiffs argue that Tennessee law should apply because they deny having agreed to the Maryland choice of law provision in the first place. The parties have not provided the court any caselaw guiding how to resolve this "chicken or the egg" choice of law issue.

"When deciding whether the parties agreed to arbitrate a certain matter . . . , courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options v. Kaplan*, 514 U.S. 938, 944 (1995). Given that the plaintiffs claim not to have

---

[10] The parties do not dispute that the Agreement's definition of "claims" encompasses the specific claims at issue here.

[11] This inquiry is limited to whether the parties entered into an agreement, not whether state law contract defenses preclude its enforcement.

assented to the terms of the Agreement in the first place, the court will apply Tennessee law concerning the formation of contracts, because the plaintiffs reside in Tennessee, they worked for the defendants in Tennessee, and they allegedly received and assented to the Agreement in Tennessee. Indeed, it seems that parties in most cases rarely dispute this issue in the first place. *See, e.g., Winn v. Tenet Healthcare Corp.*, 2011 WL 294407, at *4 (W.D. Tenn. Jan. 27, 2011) (applying Tennessee law to validity of agreement, where plaintiff asserted federal claims); *Smith v. Servicemaster*, 2009 WL 1457143, at *5 (M.D. Tenn. May 22, 2009) (same); *Allen v. Tenet Healthcare Corp.*, 370 F. Supp. 2d 682, 683 (M.D. Tenn. 2005) (same); *Snyder v. Myers Power Prods, Inc.*, 2010 WL 4940032, at *3 n.1 (E.D. Mich. Nov. 30, 2012) (applying Michigan law, where arbitration agreement otherwise specified that California law applied).[12]

The Sixth Circuit has specifically held that "continued employment can constitute acceptance" of an arbitration agreement under Tennessee law. *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972-73 (6th Cir. 2007) (finding that, under Tennessee law, employee "expressed valid assent" of a unilateral arbitration agreement by continuing employment, where "written materials accompanying the arbitration agreement clearly stated that continued employment after the effective date of the [] Program would constitute the employee's acceptance of the agreement to arbitrate"); *see also Fisher v. GE Med. Sys.*, 276 F. Supp. 2d 891,

---

[12] Although Tennessee law applies here, the result would the same under Maryland law, which incorporates the same basic contract principles as Tennessee, as described in the defendants' Memorandum of Law supporting the Motion to Compel Arbitration here (Docket No. 9 at pp. 9-10). *See Cheek v. United Healthcare of the Mid-Atlantic, Inc.*, 835 A.2d 656, 661-662, 665 (Md. 2003); *Society of Am. Foresters v. Renewable Natural Res. Defense Fund*, 689 A.2d 662, 667 (Md. Ct. Spec. App. 1997); *Falls v. ICI, Inc.*, 57 A.2d 521, 526 (Md. Ct. Spec. App. 2012); *Holmes v. Coverall*, 649 A.2d 365, 371 (Md. 1994); *Porter v. Gen. Boiler Casing Co.*, 396 A.2d 1090, 1094-95 (Md. 1979).

895 (M.D. Tenn. 2003) (applying Tennessee law); *Tillman v. Macy's, Inc.*, 735 F.3d 453 (6th Cir. 2013) (applying similar Michigan law principles). In *Seawright*, the Sixth Circuit also found that, under Tennessee law, mutual promises to arbitrate constitute sufficient consideration for an arbitration agreement. 507 F.3d at 974.[13]

Here, the terms of the Agreement are unambiguous: they state clearly and unequivocally that Five Star had implemented a new arbitration policy, that an existing employee's continued employment would reflect assent to the Agreement's terms, and (as to existing employees) that the employees had the right to opt out of the policy through a simple mechanism, which the Agreement highlighted in capital letters and bold type. Antwine, Booker, Wurm, and Ridley do not dispute that they were made aware of the Agreement. Indeed, the Acknowledgement Forms (hard copy and written) confirm that they received the Agreement and had the opportunity to review it. In fact, Ridley waited eight days to sign the electronic Acknowledgement Form, Booker, who was present at the June 2012 meeting, waited 20 days to return the hard copy Acknowledgement Form, as did numerous other staff members.

---

[13] In Tennessee, an arbitration agreement does not need to be signed to be enforceable; indeed, "[w]hat is critical is mutual assent to be bound," which is determined by "us[ing] an objective standard based on the manifestations of the parties." *T.R. Mills Constr., Inc. v. WRH Enters., LLC*, 93 S.W.3d 861, 866 (Tenn. Ct. App. 2002). "In other words, [courts] must determine whether a reasonable onlooker, based upon the parties' outward manifestations, would conclude that [the parties] agreed to be bound by the terms of the written contract." *Moody Realty Co., Inc. v. Huestis*, 237 S.W.3d 666, 674 (Tenn. Ct. App. 2007). Furthermore, although "mutual assent is essential to the formation of a contract, mutual assent is gathered from the language of the contract rather than the unexpressed or undisclosed intentions of the parties." *Broadnax v. Quince Nursing Home & Rehab. Ctr., LLC*, 2009 WL 2425959, at *3 (Tenn. Ct. App. Aug. 10, 2009) (quoting *Robert J. Denley Co., Inc. v. Neal Smith Constr. Co., Inc.*, 2007 WL 1153121, at *4 (Tenn. Ct. App. Apr. 19, 2007)) (enforcing arbitration agreement). Thus, Tennessee law "conclusively presumes that the parties to a contract understood its obligations, and evidence is not admissible to show that their understanding was in fact otherwise." *Id.*

The forms signed by Antwine, Booker, and Wurm also contained a provision explicitly (and gratuitously) reminding them of certain provisions of the Agreement, including their contractual right to opt out of it. As to Ridley, it makes no difference that Ridley's electronic Acknowledgement Form did not also contain a similar provision specifically reminding her about the opt out provision, which was explicitly set forth in the underlying Agreement in the first place. In other words, the Acknowledgment Forms were not *necessary* to form an arbitration agreement between the plaintiffs and Five Star, but they do show that the plaintiffs in fact received and had the opportunity to review the Agreement (including its terms concerning assent and their right to opt out of it).

Even Antwine acknowledges that, at the June 2012 meeting, Parker made her aware of the existence and basic features of the Agreement, which she claims she believed were unfair. The fact that Antwine or Ridley subjectively may have construed the documents differently does not change their plain meaning.[14] Furthermore, even if Antwine and other plaintiffs in fact "vehemently" believed that the Agreement's terms were unfair at the time, the Agreement explicitly informed them of their right to opt out by the simple expedient of sending a letter to Five Star. Regardless of Parker's verbal representations at the June 2012 meeting (which are potentially relevant only to Antwine, Wurm, and Booker in the first place),[15] the Agreement's

---

[14] Notably, neither Wurm nor Booker has filed an affidavit to the same effect.

[15] Although the court need not resolve issues of credibility in light of its legal findings, the court notes that Antwine's affidavit contains representations that are inadmissible or inconsistent with the record. For example, although Antwine suggests that Parker forced the June 2012 meeting's participants to sign the Acknowledgement Form without giving them adequate time to review it, one of Antwine's co-plaintiffs waited 20 days to return the signed form and at least 15 other meeting participants did the same. It is also significant that neither Booker nor Wurm filed an affidavit corroborating Antwine's account of the June 2012 meeting.

terms concerning assent by continued employment are clear and unambiguous. Therefore, under

Tennessee law, the plaintiffs' continued employment constituted assent to the Agreement. The

circumstances presented here are analogous to those presented in *Seawright* and *Fisher*, where

the Sixth Circuit and this court found, under similar circumstances, that the plaintiffs had validly

assented to the arbitration agreements at issue under Tennessee law.

Accordingly, the court finds that, in addition to Williams (who does not challenge that

she executed the Agreement), Antwine, Wurm, Booker and Ridley assented to the Agreement.

### C. Enforceability Challenges

Once the court determines that the parties entered into the Agreement, the Delegation

Provision in the Agreement directs the court to refer any further issues concerning the

interpretation and enforceability of the Agreement to the arbitrator. The court regards the

Delegation Provision as a "clear and unmistakable" delegation of those threshold issues, which

include the plaintiffs' enforceability challenges, to the arbitrator. *See Crossville Med. Oncology,*

*P.C. v. Glenwood Sys., LLC*, 485 F. App'x 821, 823 (6th Cir. 2012) ("[T]he question 'who has

the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter.

Did the parties agree to submit the arbitrability question itself to arbitration?"); *see also Rai v.*

*Ernst & Young, LLP*, 2010 WL 3518056, at *4-*5 (E.D. Mich. Sept. 8, 2010); *Muhammad v.*

*Advanced Servs., Inc.*, 2010 WL 3853230, at *5 (W.D. Tenn. Aug. 24, 2010). The Supreme

Court has expressly found that delegation clauses must be enforced, absent a valid challenge

specific to the delegation clause – as opposed to a challenge to the enforceability of the

Agreement as a whole. *See Jackson*, 130 S. Ct. at 2777; *see also Madgrigal v. AT&T Wireless*

*Servs. Inc.*, 2010 WL 5343299, at *2 (E.D. Cal. Dec. 20, 2010) ("*Jackson* [] confirmed that a

provision delegating to the arbitrator authority to determine the validity of an arbitration

agreement bars a court from adjudicating a party's claim of unconscionability unless that claim is based on alleged unconscionability of the delegation provision itself.")

Here, the plaintiffs do not assert any challenges specific to the Delegation Provision. Accordingly, having the found that the plaintiffs assented to the Agreement, it will be for the arbitrator to address the merits of the plaintiffs' remaining challenges in the first instance. Nevertheless, the court takes notice of the fact that the defendants have represented to this court that, in arbitration, they will not take the position that the Agreement will limit the arbitrator's discretion to award fees to the plaintiffs in this case under § 1988, should one or more plaintiffs prevail on their § 1981 claims.[16]  (Docket No. 27 at p. 17.)

## MOTION TO DISMISS OR CLARIFY (AS TO WYNN)

### I.  Rule 12 and Rule 12(e) Standards.

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff."  *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002).  The Federal Rules of Civil Procedure require only that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and

---

[16] The defendants' position is compelled by prevailing law in any case.  The Sixth Circuit and other circuits have consistently found that, under the plain language of Title VII or § 1981, a court has discretion to award fees to prevailing plaintiffs under the relevant statutory fee-shifting provisions.  *See* 42 U.S.C. § 1988 (providing that "the court, in its discretion," may allow attorney's fees to a prevailing plaintiff); *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 673 (6th Cir. 2003) ("Under Title VII it is clear that 'a prevailing plaintiff ordinarily is to be awarded attorney's fees in all but special circumstances.'") (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 417 (1978)); *see also McCaskill v. SCI Mgmt. Corp.*, 285 F.3d 623, 625 (7th Cir. 2002).  Here, if an arbitrator were to construe the Agreement as precluding or limiting the arbitrator from exercising that discretion with respect to a prevailing plaintiff, the court would likely regard that conclusion as manifestly disregarding the text of § 1988.

the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 1950.

Fed. R. Civ. P. 12(e) allows a party to request a more definite statement when the pleading "is so vague or ambiguous that the party cannot reasonably prepare a response." Thus, "[i]f a pleading fails to specify the allegations in a manner that provides sufficient notice, a defendant can move for a more definite statement." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002). A trial court has discretion to grant a Rule 12(e) motion. *Smith v. Litton Loan Serv'g*, 2011 WL 4696177, at *1 (N.D. Ohio Oct. 5, 2011); *Sheet Metal Employers Indus. Promotion Fund v. Absolut Balancing Co., Inc.*, 2013 WL 2395073, at *2 (E.D. Mich. May 31, 2013).

## II. <u>Analysis of Specific Claims by Wynn</u>

### A. TAPA

The TAPA is designed to protect an "adult" who, "because of mental or physical dysfunctioning or advanced age is unable to manage such person's own resources, carry out the activities of daily living, or protect such person from neglect, hazardous or abusive situations without assistance from others and who has no available, willing, and responsibly able person for assistance and who may be in need of protective services." Tenn. Code. Ann. § 71-6-102(2). The Tennessee General Assembly passed the TAPA to protect these types of adults "from abuse, neglect or exploitation by requiring reporting of suspected cases by any person having cause to believe that such cases exist." *Id.* § 71-6-101(b)(1). TAPA specifically applies against "caretakers," who are defined to include "an individual or institution who has assumed the duty to provide for the care of the adult by contract or agreement." *Id.* § 71-6-120(5); *see Estate of French of Stratford House*, 333 S.W.3d 546, 564-65 (Tenn. 2011). If a person, including an "alternate care facility employee," has "reasonable cause to suspect that an adult has suffered abuse, neglect, or exploitation," that person must make a report "in accordance with this part." Tenn. Code. Ann. § 71-6-103(b)(1).

As a default rule, a facility employee who observes or suspects abuse of an adult must make a report to "the department" – meaning the Tennessee Department of Human Services ("TDHS") – that includes certain types of information. Tenn. Code Ann. § 71-6-103(c). However:

> If a hospital, clinic, school, or any other organization or agency responsible for the care of adults has a specific procedure, approved by the director of adult protective services for the department, or the director's designee, for the protection of adults who are victims of abuse, neglect, or exploitation, any member of its staff whose duty to report under this part arises from the performance of the staff member's services as a member of the staff of the organization may, at the staff member's option, fulfill that duty by reporting instead to the person in charge of the organization or the organization head's designee who shall make the report in accordance with this chapter.

*Id.* § 71-6-103(b).  In other words, if a facility such as Morningside has an approved procedure by which its staff members can report suspected abuse, then the staff member can fulfill its duty by reporting the matter internally to the person in charge of the organization or that person's designee.  Under the TAPA, "[a]ny person making a report under this part shall have a civil cause of action for appropriate compensatory and punitive damages against any person who causes a detrimental change in the employment status of the reporting party by reason of the report."  *Id.* § 71-6-105.

Here, the Complaint alleges that Wynn reported the suspected abuse of a Morningside resident to (1) the resident's son (Mr. Kessler), (2) one of her supervisors, who in turn promised to, and did, report the matter to Parker, and (3) unspecified "State representatives," with whom she has been in "communication regarding the incidents of abuse and their terminations."  The question is whether any of these actions qualify as a "report" that discharged Wynn's responsibilities under the TAPA, for which TAPA would protect her.  The report to Mr. Kessler plainly does not qualify.  As to the latter two reports, it is unclear from the allegations whether they plausibly qualified for protection against retaliation under TAPA.  With respect to the reports to "State representatives," the Complaint fails to specify (1) the nature of the communications, (2) whether the communications took place *before* the defendants allegedly took adverse actions against Wynn (the context of the allegation suggests afterwards); and (3) whether the identified "representatives" were members of the TDHS.  With respect to Wynn's internal report to her supervisor, the Complaint does not specify whether the supervisor to whom Wynn reported the suspected abuse was a designee of the defendants under an approved procedure.

Because the court will be ordering Wynn to file a more definite statement concerning her § 1981 and Tennessee common law claims, the court will (rather than dismiss the TAPA claims without prejudice) permit Wynn to re-plead her TAPA claims, assuming that she believes she can maintain them in light of TAPA's requirements for protection against retaliation.

## B. § 1981 Claim

The defendants justifiably complain that Wynn's Complaint is somewhat vague concerning certain aspects of her race discrimination claim under § 1981. In her response, Wynn purports to clarify that she believes her termination was motivated by her race.[17] It is difficult to discern whether she maintains that Five Star took any other actions against her specifically, although it may be that the remaining allegations are designed to support her "pattern or practice" claim and the request for class relief. On the other hand, the court's referral of the remaining claims to arbitration may render some of those allegations moot. Neither the court nor the defendants should have to speculate on these issues. Accordingly, the court will order Wynn to define her § 1981 claim more clearly, including (but not limited to) whether she alleges any additional adverse actions by the defendants against her specifically. Once clarified, the defendants will have the opportunity to address the sufficiency of Wynn's Amended Complaint in the ordinary course.

## C. Tennessee Common Law Claims

Wynn's Complaint does not specify the nature of the "Tennessee common law claims" that she asserts. In her response, Wynn contends that she is pursuing a Tennessee common law

---

[17] Wynn also alleges that she was terminated for reporting abuse. Presumably the discovery process, if reached, would flesh out the extent to which either or both of these reasons motivated the defendants' decision to terminate her.

claim for retaliatory discharge.  The court will grant Wynn leave to file a more definite statement confirming that she is pursuing only this one claim under Tennessee common law.

### D.  Class Action Claims

Under Local Rule 23.01, a plaintiff asserting a class action claim must comply with a number of special pleading requirements, including appropriate references to Fed. R. Civ. P. 23 and "[a]ppropriate allegations thought to justify such claim," such as the number of putative class members and the basis on which the plaintiff is an appropriate class representative.  Here, the Complaint does not remotely comply with the requirements of L.R. 23.01.  Because Wynn's class claim is procedurally deficient, it is subject to dismissal.  Because the court is permitting Wynn to replead or clarify her other claims, the court will also permit Wynn to amend her Complaint in an effort to comply with L.R. 23.01.

On a related note, plaintiffs Antwine, Booker, Wurm, Ridley and Williams contend that the court should remand only their *individual* claims to arbitration and, therefore, should retain jurisdiction over their classwide claims.  With respect to all plaintiffs other than Wynn, the court has already found that the plaintiffs must arbitrate their claims and that it will be for the arbitrator to determine whether, among other things, the class waiver to which they assented is unenforceable.  As to Wynn, the court will permit Wynn to re-plead her claims for class relief as set forth in the previous paragraph.  The court expresses no opinion as to whether the amended allegations will meet the Rule 12 or Rule 23 standards, nor does the court address how Wynn's amended claims for class relief may be affected by the mandatory arbitration Agreements to which many members of the putative class (if not all of them) are likely subject.

In sum, the court will permit Wynn to amend her Complaint as to all of her claims.

### CONCLUSION

For the reasons set forth herein, the defendants' Motion to Compel Arbitration will be granted and the defendants' Motion to Dismiss or for a More Definite Statement will be granted in part and denied in part. All claims by plaintiffs Antwine, Booker, Wurm, Ridley, and Williams will be referred to individual arbitration, where an arbitrator (or arbitrators) will be obligated to address the plaintiffs' challenges that the Agreement is unenforceable in whole or in part. The court will order Wynn, whose claims are not subject to mandatory arbitration, to file an Amended Complaint in compliance with this opinion by June 30, 2014.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge