# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| LASHIKA WYNN, ) | |
| ) | |
|     Plaintiffs, ) | |
| ) | Case No. 3:13-cv-01338 |
| v. ) | Judge Aleta A. Trauger |
| ) | |
| FIVE STAR QUALITY CARE TRUST and ) | |
| MORNINGSIDE OF BELMONT, ) | |
| ) | |
|     Defendants, ) | |

## MEMORANDUM & ORDER

The defendant has filed a Partial Motion to Dismiss for Failure to State a Claim (Docket No. 37), to which the plaintiff has filed a Response in opposition (Docket No. 39). For the reasons stated herein, the motion will be denied.

## BACKGROUND

Defendant Five Star Quality Care, Inc. ("Five Star")[1] operates elder care facilities, including an elder care facility in Nashville, Tennessee. The plaintiff, Lashika Wynn, was originally among several former Five Star employees who asserted claims against Five Star for race discrimination (on behalf of themselves and all others similarly situated), retaliation, and unspecified violations of Tennessee common law. As to all plaintiffs other than Wynn, the court

---

[1] Wynn's Amended Complaint identifies "Five Star Quality Care" and "Morningside of Belmont" as separate corporate defendants. Five Star alleges that these entities are in fact one defendant named Five Star Quality Care, Inc. In advance of the initial case management conference, counsel for the plaintiff and defendant should confer and agree on the appropriate identity of the corporate defendant or defendants in this lawsuit, unless there are legitimate grounds for debate.

1

referred the claims to arbitration. (Docket No. 35.) As to Wynn, the court ordered Wynn to file a more definite statement of her claims. (*Id.*)

On June 30, 2014, Wynn filed an Amended Complaint (Docket No. 36), in which she asserts claims individually against Five Star for (1) retaliation under the Tennessee Public Protection Act ("TPPA"), Tenn. Code Ann. § 50-1-304; (2) retaliatory discharge under the Tennessee common law; (3) retaliatory discharge under the Tennessee Adult Protection Act ("TAPA"), Tenn. Code Ann. § 71-6-101 *et seq.*, and (4) race discrimination under 42 U.S.C. § 1981 and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 *et seq.*[2] Five Star has moved to dismiss the last two of these claims.[3]

Morningside of Belmont ("Morningside") is an elder care facility in the Nashville area operated by Five Star.[4] Wynn, who is an African-American female, formerly worked as a Resident Assistant ("RA") at Morningside from May 2010 through her termination on October 1, 2013. RAs provide care for residents, support the nurses, assist residents in taking medications, assist residents with showers and bathing, and assist residents with dining and housekeeping. RAs are prohibited from striking, shaking, or screaming at residents, and from otherwise abusing

---

[2] Wynn claims to have filed a charge with the Equal Employment Opportunity Commission ("EEOC") that remains pending. The Amended Complaint contains a "Reservation of Rights" to assert claims under Title VII for discrimination and retaliation, once Wynn has administratively exhausted her claims before the EEOC.

[3] The court had originally stayed the claims of the remaining original plaintiffs pending arbitration. The Amended Complaint is captioned only in Wynn's name individually. At the forthcoming initial case management conference, Wynn and Five Star should be prepared to address whether the "stay" should remain in place or, in the alternative, whether the court should vacate the stay and terminate the other plaintiffs as parties.

[4] The court's summary of the facts is drawn from the allegations in the Amended Complaint, which the court accepts as true for purposes of this opinion.

or neglecting the residents. RAs at Morningside must report any and all actual or suspected incidents of resident abuse or neglect.

From January 2012 through Wynn's termination in October 2013, Lee Parker, a white male, served as Morningside's Executive Director. Wynn alleges that, when addressing black Morningside staff members, Parker referred to himself as "Redneck," "Alabama Redneck," and other similar terms. Wynn also alleges that, during Wynn's period of employment, Parker repeatedly made derogatory racial comments about her and other black employees. For example, Parker "divisively and condescendingly" referred to black employees as "you people," "your kind," or similar statements. These comments offended Wynn and other black employees. Wynn alleges that Parker intentionally fostered a racially hostile and "divisive" work environment at Morningside.

According to the Amended Complaint, during a staff meeting attended by Morningside's black employees, Parker stated that it was his intention to "get rid of all the monkeys" at Morningside – referring to the black employees, many of whom had been hired by Parker's predecessor. Wynn alleges that, under Parker's administration, Wynn and other black employees received undeserved performance criticisms and job scrutiny, received unfair or unjust write-ups or termination for conduct in which white employees were permitted to engage, were denied career advancement opportunities or demoted from higher level positions in favor of less qualified white employees, and generally were "forced to suffer through constant derogatory and discriminatory comments and work actions" directed at black employees. Wynn believes that, in furtherance of Parker's stated plan to get rid of the black employees at Morningside, Parker fired or disciplined black employees under false pretenses and replaced them with white employees.

With respect to Ms. Wynn, these issues came to a head in September 2013. On September 21, 2013, Wynn and another RA, Monica Flowers, observed a fellow RA, Cheryl Smith, violently strike, scream at, and shake Ms. Rose Kessler, a 92-year-old wheelchair-bound resident who was suffering from Alzheimer's disease and other physical impairments. After observing this incident, Wynn conferred with Flowers and another RA, Ronetra Antwine, about what to do. After this conference, Wynn, Antwine, and Flowers each separately made a verbal complaint about it to their supervisor, "Elana" (last name not specified). After receiving these complaints, Elana examined Ms. Kessler for injuries and told Wynn and the other two RAs that she would report their complaints about RA Smith's conduct to Executive Director Parker. According to Wynn, Elana in fact reported the matter to Parker that day.

Wynn alleges that, after Parker received the report, he called Ms. Kessler's son, Jim Kessler, who was a frequent visitor of the Morningside facility and who had developed friendships with the RAs. Rather than tell the truth to Mr. Kessler, Parker lied: he told Mr. Kessler that *Ms. Kessler* had physically assaulted another resident and that, as a consequence, she would be evicted from Morningside. Parker repeated this lie to Mr. Kessler in person that same day.

On September 22, 2013 (the next day), Mr. Kessler visited Morningside, where he engaged Wynn and Antwine in a conversation. He informed them that his mother was being evicted for striking another resident. Wynn and Antwine, recognizing Parker's deception, told Mr. Kessler that they had reported internally the day before that another RA had abused Ms. Kessler. Wynn and Antwine also alerted "State of Tennessee agents" about the abuse of Ms. Kessler.

4

On September 23, 2013, Mr. Kessler informed Five Star about Wynn's report of abuse. Unspecified white "agents" of Five Star acknowledged to Mr. Kessler that RA Smith had struck Ms. Kessler and that Five Star had already received complaints from Wynn and others about the matter. On the same day that Mr. Kessler confronted Five Star about this issue, Wynn and Antwine were placed on suspension. According to Wynn, "agents" of Five Star expressed hostility towards Wynn for refusing to remain silent about RA Smith's abuse of Ms. Kessler. On October 1, 2013, Five Star terminated Wynn and Antwine. Wynn alleges that she was treated differently than white employees who engaged in similar conduct. For example, Five Star did not terminate the white employees who acknowledged to Mr. Kessler that Ms. Kessler may have been abused. Wynn alleges that her termination was a pretext for discrimination or retaliation by Five Star.

## **RULE 12 STANDARD**

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

## ANALYSIS

Five Star has moved to dismiss Wynn's TAPA claim and her claims of race discrimination "other than her theory of wrongful termination."

### I. TAPA claim

If a caretaker such as Wynn has reasonable cause to suspect that an adult has suffered abuse, neglect, or exploitation, TAPA requires the caretaker to report that abuse. Tenn. Code Ann. § 71-6-103(b)(1). Caretakers can meet this obligation in either of two ways: (1) by reporting abuse to the Tennessee Department of Human Services ("TDHS") in accordance with Tenn. Code Ann. § 71-6-103(c), or (2) by reporting internally under a State-approved internal procedure in accordance with Tenn. Code Ann. § 71-6-103(b)(2). Perhaps anticipating that a caretaker might refrain from reporting abuse out of fear of retaliation, TAPA provides a private cause of action to any caretaker who suffers retaliation for making a report of abuse. Tenn. Code Ann. § 71-6-105.

In the previous iteration of the Complaint, the court observed that Wynn's allegations were ambiguous as to whether she had plausibly complied with either of TAPA's reporting

6

requirements. In her Amended Complaint, Wynn has corrected these deficiencies only in part, but the corrections she has made are sufficient to state a claim when reasonable inferences are drawn in her favor.

Paragraph 11 of the Complaint alleges that RAs at Morningside were required to report all incidents of abuse or neglect. Drawing a reasonable inference in favor of Wynn, Wynn's allegations plausibly establish that Wynn was required to report the matter internally under company policy. Wynn also alleges that she in fact complied with this internal reporting obligation by reporting the abuse of Ms. Kessler to her supervisor, Elana, who in turn reported the matter up the chain to Executive Director Parker. These allegations are sufficient to state a TAPA retaliation claim. Whether Wynn's internal complaint in fact qualified as a report subject to protection under TAPA, Tenn. Code Ann. § 71-6-103(b)(2), will be an appropriate subject of discovery.

Wynn also claims that she complied with TAPA by reporting the matter to unspecified "State of Tennessee agents." *See* Am. Compl. ¶ 38. It is a closer call whether this allegation, standing alone, would support a claim that Wynn complied with Tenn. Code Ann. § 71-6-103(c) by reporting the matter to the TDHS – particularly where the court pointed out this ambiguity in its previous opinion. Be that as it may, discovery will flesh out whether the Tennessee officials to whom Wynn complained were with the TDHS, and Wynn has already alleged sufficient facts to show a potentially viable TAPA retaliation claim premised on an internal complaint. There would be no practical benefit to precluding Wynn from advancing both theories of protection under TAPA here.

For these reasons, the court will permit Wynn's TAPA claim to proceed without qualification.

## II. Race Discrimination Claims

In the original Complaint, the allegations related to multiple plaintiffs, making it unclear which racially hostile or discriminatory actions Wynn (as opposed to the other plaintiffs) purported to witness, experience, or become aware of. By contrast, Wynn's Amended Complaint relates only to her experiences, a change that sufficiently clarifies the basis for her claims.

In substance, Wynn's Amended Complaint contains ample allegations establishing claims for race discrimination in multiple forms, including the imposition of a racially hostile work environment, wrongful termination on the basis of race, and wrongful termination as a form of retaliation. In the course of setting out these claims, Wynn alleges a host of racially hostile actions that she experienced, witnessed, or became aware of, all of which can support race discrimination claims under § 1981 and, therefore, under the THRA as well. *See Jackson v. Quanex*, 191 F.3d 647, 661 (6th Cir. 1999); *Berryman v. SuperValue Holdings, Inc.*, 669 F.3d 714, 717 (6th Cir. 2012); *Jackson v. Bd. of Educ. of Memphis City Schs. of Memphis, Tenn.*, 494 F. App'x 539, 543 n.1 (6th Cir. 2012). Wynn's allegations concerning racially discriminatory acts at Five Star, many of which are highly specific, are more than sufficient to state plausible discrimination and retaliation claims under § 1981 and the THRA.

## CONCLUSION

For the reasons set forth herein, the defendant's motion is **DENIED**. The court will reset the initial case management conference by separate order.

It is so **ORDERED**.

Enter this 10th day of October 2014.

_____
ALETA A. TRAUGER
United States District Judge